UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JONATHAN CUMMINGS; AND HILARY HEGENER; | Case No: C 17-6246 SBA |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUA SPONTE ENTERING SUMMARY JUDGMENT FOR DEFENDANTS MARK ROBINSON AND DAVID LEE** |
| vs. | |
| WORKTAP, INC.; MARK ROBINSON; AND DAVID LEE; | |
| Defendants. | Dkt. 99, 100 |

The instant action arises from a contract dispute principally between Plaintiffs Jonathan Cummings and Hilary Hegener (collectively "Plaintiffs") and Defendant Worktap, Inc. ("Worktap"). The Second Amended Complaint ("SAC"), the operative pleading, alleges that Worktap failed to repay two convertible promissory notes from 2015 and 2016 (collectively "Notes") in the amounts of $150,000 and $50,000, respectively, plus interest. The first and second causes of action are for breach of contract against Worktap. The third and fourth causes of action allege that Defendants Mark Robinson ("Robinson") and David Lee ("Lee") (together "Individual Defendants") are personally liable on the Notes as alter egos of Worktap. As relief, Plaintiffs seek repayment of the Notes, plus interest and attorney's fees. The Court has entered Worktap's default, leaving only the Individual Defendants as active party-defendants in the action.

The parties are now before the Court on Plaintiffs' Motion for Summary Judgment Against Defendants Mark Robinson and David Lee. Having read and considered the papers submitted and being fully informed, the Court DENIES Plaintiffs' motion and sua sponte GRANTS summary judgment for the Individual Defendants. The Court, in its discretion,

finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.     BACKGROUND

### A.     FACTUAL SUMMARY

#### 1.     Formation of Worktap

Robinson founded Worktap in 2012 while working out of his home.  Robinson Decl. ¶ 4, Dkt. 107-2.  Robinson incorporated Worktap on January 9, 2012. Id. & Exs. A-E. To incorporate Worktap, Robinson used LegalZoom, a legal form site, to draft and file the requisite documents with the California Secretary of State.  Id.  Robinson also completed other tasks and paperwork, such as the corporation's by-laws, required to form and maintain a corporation.  Id.  In accordance with Worktap's by-laws, Robinson appointed himself as the sole Board of Director.  Id. ¶¶ 4-5.  A few days after incorporating Worktap, Robinson executed a stock purchase agreement in which he invested $10,000 in exchange for 10 million shares of Worktap common stock.  Id. ¶ 6 & Ex. D.  Over the course of the next two years, Robinson used his $10,000 investment and "sweat equity" to grow Worktap into a viable business.  Id. ¶ 8.  Robinson eventually completed development of an "onboarding platform that became the basis of Worktap's consumer product."  Id.

On January 15, 2014, Worktap enacted a resolution to appoint Defendant Lee as a board member.  Id. ¶ 9.  A few months later, when Worktap's product was ready for customer presentations, Lee began working at Worktap as its Senior Vice President of Sales.  Lee Decl. ¶ 3, Dkt. 107-1.  Although his annual salary was $160,000, he typically received only double the minimum wage due to Worktap's cash flow issues.  Id. ¶ 6.  In February 2015, Lee received 16 million shares of Worktap, with 25% vesting immediately and the remainder vesting over time.  Id.

In the meantime, in or about August 2014, Worktap released its product and began to make customer sales.  Robinson Decl. ¶ 14.  Around the same time-period, Worktap began renting an office in San Rafael, California, and opened a bank account at the Bank of Marin.  Id. ¶¶ 11, 12.  Worktap had not opened a bank account before then because the

company was not previously transacting business.  Id. ¶ 11.  Over the next year, Worktap hired four additional employees, including Christopher Cummings ("Chris"), the brother of Plaintiff Jonathan Cummings.  Id. ¶¶ 14-16.[1]

Worktap's relationship with Chris came about because Lee and Chris' children attended the same school in Marin County.  Lee Decl. ¶ 7.  In March 2015, Worktap initially offered Chris an "advisory" role, as it would have been too costly to hire him as a full-time employee.  Id.  However, Chris told the Individual Defendants that he would use his Ivy League connections to foster significant investments in Worktap.  Id. ¶ 8.  Chris further represented that if he were hired, his sibling—Plaintiff Jonathan Cummings—would make an early investment in the sum of $150,000.  Id.  Persuaded Chris would add value as an employee, Worktap hired him in April 2015 to act as the company's Senior Vice-President of Corporate Development and Finance.  Robinson Decl. ¶ 19.  In that capacity, Chris had two primary responsibilities: (1) fundraising (i.e., securing outside investments in Worktap); and (2) finance and accounting.  Lee Decl. ¶ 8.  As compensation, Chris was to be paid a salary $170,000 per year and receive a 3% equity stake in Worktap.  Id.  In Worktap's view, Chris' successful fundraising was essential to the continued operation of the company.  Robinson Decl. ¶ 11.

### 2.    Fundraising

Prior to Chris' hiring, Lee began to solicit investors in or about August 2014.  Id. ¶ 13.  Between October 1, 2014, and March 22, 2015, Worktap raised $319,000 from different investors.  Id.

As noted, Chris was hired by Worktap in April 2015.  In July 2015, he secured $350,000 in capital from various investors, including $150,000 from Plaintiffs.  4/19/18 Order at 2, Dkt. 75.  The terms of Plaintiffs' investment were memorialized in a Note Purchase Agreement, which included a Convertible Promissory Note (collectively "2015 Note"), dated April 13, 2015.  Id.  In October 2015, another investor invested $50,000.

---

[1] Worktap hired its first employee in February 2015.  Robinson Decl. ¶ 15.  In June and August 2015, the company hired two other employees, aside from Chris.  Id. ¶ 16.

Robinson Decl. ¶ 24.  Nevertheless, Chris' financing efforts were not resulting in the level of investment the company had expected.  Id. ¶ 24.  As such, in November 2015, Robinson informed Chris that if he were unable to raise additional monies, the company would be unable to make payroll and would have to lay off employees, including Chris.  Id.

In December 2015 or January 2016, Chris informed Robinson that he might be motivated to work harder if Worktap increased his equity stake in the company.  Id. ¶ 25.  Shortly thereafter, on January 27, 2016, Plaintiffs invested an additional $50,000 in Worktap.  4/19/18 Order at 2.  The investment was memorialized in a Note Purchase Agreement and Convertible Promissory Note (collectively "2016 Note").

Throughout 2016, Worktap continued to struggle financially and experienced cash flow issues due to the lack of funding.  Id. ¶ 26.  Robinson again informed Chris that since he was Worktap's highest paid employee, the company would be unable to maintain his employment unless he secured additional investments.  Id.  Beginning in December 2015 and throughout 2016, Chris loaned monies to Worktap that were used, in part, to ensure that Worktap could make payroll.  Id. ¶ 28; C. Cummings Decl. ¶¶ 44-46, Dkt. 101.  Worktap repaid those loans, often within days.  Robinson Decl. ¶ 28.

In September 2016, Chris secured his final investment in the sum of $25,000.  Id. ¶ 29.  In December 2016, Chris told Robinson that if he did not receive additional equity, he would leave.  Id. ¶ 30.  Robinson responded that he was prepared to accept Chris' resignation, but Chris said he was not serious.  Id.  However, Chris thereafter ceased communicating with Robinson and Lee, abandoned his payroll duties and "left Worktap locked out of its payroll provider account with Tri-Net."  Id.  Worktap eventually terminated Chris in January 2017 for insubordination and abandonment of duties.  Id. ¶ 31.  Following Chris' termination, Robinson learned that Chris allegedly had engaged in a host of misconduct, including, inter alia: completely mismanaging his accounting and financial duties; misrepresenting the company's financial status; and writing company checks to himself.  Id. ¶¶ 31-33.  Chris also failed to provide the Individual Defendants documents pertaining to the promissory notes executed during the 2015-2016 time-period.  Id.

**B.  PROCEDURAL HISTORY[2]**

Plaintiffs filed their initial Complaint on October 27, 2017, and a First Amended Complaint on December 18, 2017.  Dkt. 1, 18.  Plaintiffs filed their SAC on January 5, 2018.  Dkt. 21. The first and second causes of action are for breach of contract based on the 2015 Note and 2016 Note, respectively.  The third and fourth causes of action allege alter ego liability as to Robinson and Lee.  Defendants answered the SAC and filed a counterclaim against Cummings.  Dkt. 26, 28.  As to the 2016 Note, the Counterclaim alleges, inter alia, that Cummings and his brother Christopher altered the parties' agreement to give Plaintiffs more favorable discount rates and valuation and conversion terms. Counterclaim ¶ 18, Dkt. 28.

On October 10, 2018, the Court granted defense counsel's motion to withdraw as counsel of record.  Dkt. 88.  The Court stayed the action for thirty days to allow Worktap—a corporation which can only appear in federal court through an attorney—the opportunity to retain new counsel.  Id.  Worktap failed to retain new counsel within the specified time-frame, which resulted in its default being entered by the Clerk on November 20, 2018.  Dkt. 94.  The Individual Defendants have since retained new counsel.  Dkt. 105.

On November 11, 2018, Plaintiffs submitted a proposed order for the entry of default judgment against Worktap.  Dkt. 92.  Because the proposed order was not accompanied by a motion or application, the Court struck it from the record.  Dkt. 93.

Shortly thereafter, Plaintiffs filed a motion seeking leave to file a motion for reconsideration and to modify the Court's pretrial schedule.  Dkt. 95.  They claimed, among other things, that a scheduling modification was necessary so that they could file out-of-time motions for default judgment as to Worktap and for summary judgment as to the

---

[2] This case has a long and tortured procedural history.  The following summary is an abbreviated recitation of the extensive proceedings.

Individual Defendants.  Id.[3]  The Court denied all requests for lack of good cause.  Dkt. 96 at 3-6.  However, in the interests of judicial efficiency, the Court directed Plaintiffs to file a motion for summary judgment as to the alter ego issue by no later than January 4, 2019.  Id. at 6.  The Court further indicated that upon resolution of Plaintiffs' summary judgment motion, the Court would set a briefing schedule on Plaintiffs' motion for default judgment as to Worktap.  Id.

On December 24, 2018, Plaintiffs filed an administrative motion for leave to submit a 35-page motion for summary judgment.  Dkt. 97; see Civ. L.R. 7-2 (limiting motions to 25 pages).  The Court denied the request but sua sponte extended the filing deadline to January 11, 2019 "[t]o facilitate Plaintiffs' efforts to file a concise motion."  Dkt. 98 at 2.  Notwithstanding the week-long extension provided, Plaintiffs, without seeking or obtaining prior leave of court, filed their untimely motion for summary judgment on January 12, 2019.  Dkt. 100.[4]  Accompanying the motion is an administrative motion to seal certain of the exhibits presented in support of the motion.  Dkt. 99.  Plaintiffs did not serve unredacted copies of the subject exhibits until January 21, 2019.  Gibson Decl. ¶ 5, Dkt. 107-2.

Plaintiffs' summary judgment motion seeks a determination, as a matter of law, that the Individual Defendants are alter egos of Worktap and therefore are personally liable to Plaintiffs for repayment of the Notes, plus interest and attorney's fees.  Aside from a declaration from their counsel, the substance of Plaintiffs' motion is based entirely on the

---

[3] On February 22, 2018, the Court issued an Order for Pretrial Preparation, which, inter alia, set the discovery cut-off as October 8, 2018, a trial date of April 29, 2019, and the law and motion cut-off as January 4, 2019.  Dkt. 61.  To comply with the 35-day notice requirement under Local Rule 7-2(a), all motions should therefore have been filed by no later than November 30, 2018.

[4] Despite the additional time afforded to Plaintiffs, their motion is anything but "concise."  In addition, it is apparent that Plaintiffs have attempted to circumvent the 25-page limit by relegating a number of their arguments to lengthy footnotes—which are the approximate equivalent of 3 additional pages of text.  Plaintiffs' continual failure to comply with the Court's procedural rules in this action is well documented in prior Orders of this Court and will not be countenanced.

accompanying declaration of Chris. The Individual Defendants oppose Plaintiffs' motion on the merits and as untimely. In addition, they object to various statements and exhibits contained in Chris' declaration. The motion is fully briefed and is ripe for adjudication.[5]

## II. <u>LEGAL STANDARD</u>

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law.'" <u>Alabama v. North Carolina</u>, 560 U.S. 330, 344 (2010) (quoting Fed. Rule Civ. Proc. 56(c)) (citing cases). "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> at 323.

Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of a genuine issue of material fact. <u>Id.</u> at 324. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." <u>In re Oracle Corp. Secs. Litig.</u>, 627

_____

[5] The Individual Defendants contend that the Court should not consider Plaintiffs' summary judgment motion because it was filed late. Plaintiffs admit their motion is untimely due to "computer issues" but counter that the Individual Defendants have not suffered any resulting prejudice. Plaintiffs' response misses the mark. A scheduling order "'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 610 (9th Cir. 1992) (citation omitted). As such, a court need not consider an untimely motion, particularly where, as here, the movant failed to seek or obtain an extension of the filing deadline. <u>See</u> <u>U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff</u>, 768 F.2d 1099, 1104 (9th Cir. 1985), <u>superseded by statute on other grounds as recognized in</u> <u>Simpson v. Lear Astronics Corp.</u>, 77 F.3d 1170 (9th Cir. 1996); <u>accord</u> <u>Johnson</u>, 975 F.2d at 608. Under these circumstances, the Court need not consider the merits of the motion. Nonetheless, for the benefit of the parties and in the interests of judicial efficiency, the Court will consider the substantive arguments presented in the motion. However, the Court notes that Plaintiffs have repeatedly disregarded the Court's Local Rules, <u>see</u>, <u>e.g.</u>, Dkt. 88, 93, 96, and are warned that future violations will result in the imposition of sanctions up to and including striking the complaint and dismissal of the action.

F.3d 376, 387 (9th Cir. 2010) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. See <u>Liberty Lobby.</u>, 477 U.S. at 322-23. All reasonable inferences are to be drawn in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Only admissible evidence may be considered in ruling on a motion for summary judgment. <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 773 (9th Cir. 2002); <u>see</u> Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

 "[W]here the party moving for summary judgment has had a full and fair opportunity to prove its case, but has not succeeded in doing so, a court may enter summary judgment sua sponte for the nonmoving party." <u>Albino v. Baca</u>, 747 F.3d 1162, 1176 (9th Cir. 2014); <u>Gospel Missions of Am. v. City of Los Angeles</u>, 328 F.3d 548, 553 (9th Cir. 2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a full and fair opportunity to ventilate the issues involved in the matter.") (citation and quotation marks omitted).

### III. <u>DISCUSSION</u>

 Generally, a corporation's shareholders are not personally liable for the corporation's debts. See <u>Bing Crosby Minute Maid Corp. v. Eaton</u>, 46 Cal. 2d 484, 487 (1956). The alter ego doctrine is exception to that rule and provides that "[a] corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the [shareholder] of a corporation liable for the actions of the corporation." <u>Sonora Diamond Corp. v. Superior Court</u>, 83 Cal. App. 4th 523, 538 (2000). "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing

party is using the corporate form unjustly and in derogation of the plaintiff's interests." Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 300 (1985).[6]

The alter ego doctrine "is an extreme remedy, sparingly used," id. at 539 and "sound public policy dictates that imposition of alter ego liability be approached with caution," Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal. App. 3d 1220, 1249 (1991); see also Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003) ("The doctrine of piercing the corporate veil … is the rare exception, applied in the case of fraud or certain other exceptional circumstances, … and usually determined on a case-by-case basis.") (internal citation omitted). As a result, there is a general presumption in favor of respecting the corporate entity. Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1212 (1992).

"It is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity." Id. To overcome the presumption against imposing alter ego liability, the plaintiffs must plead and prove two elements: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." Mesler, 39 Cal. 3d at 300 (internal quotation and citation omitted). "[B]oth of these requirements must be found to exist before the corporate existence will be disregarded." Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 837 (1962). "California courts emphasize that the alter ego determination is very fact specific." Daewoo Elecs. Am. Inc. v. Opta Corp., 875 F.3d 1241, 1250 (9th Cir. 2017); see Zoran Corp. v. Chen, 185 Cal. App. 4th 799, 811 (2010). There is no right to a jury trial for alter ego claims because they are equitable in nature. Dow Jones Co. v. Avenel, 151 Cal. App. 3d 144, 147-48 (1984).

---

[6] In diversity actions, district courts refer to state law when deciding whether to pierce the corporate veil. Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1227-28 (9th Cir. 2005).

## A. UNITY OF INTEREST

With respect to the unity of interest prong, courts have found the following non-exhaustive list of factors to be relevant: (1) commingling of funds and other assets; (2) whether the individual holds himself out as liable for the debts of the corporation; (3) ownership and control of the corporation by the individual; (4) inadequate capitalization; (5) disregard of corporate formalities; and (6) lack of segregation of corporate records. See, e.g., Firstmark Capital Corp. v. Hempel Financial Corp., 859 F.2d 92, 94 (9th Cir. 1988); Sonora Diamond Corp., 83 Cal. App. 4th at 538-539; and Mid-Century Ins. Co., 9 Cal. App. 4th at 1213 n.3. Of these factors, the "inadequate capitalization, commingling of assets, [and] disregard of corporate formalities" are "critical." Tomaselli v. Transam. Ins. Co., 25 Cal. App. 4th 1269, 1285 (1994). As will be discussed below, the Court finds that Plaintiffs have failed to carry their burden of establishing the unity of interest element.

### 1. Undercapitalization

Plaintiffs contend that Individual Defendants failed to ensure that Worktap was adequately capitalized. Mot. at 18, 3-7. An undercapitalization analysis requires courts to consider the level at which the corporate entity allegedly should have been capitalized to avoid difficulties satisfying its debts. See Automotriz Del Golfo De California S. A. De C. V. v. Resnick, 47 Cal. 2d 792, 797 (1957). The failure to present facts regarding the amount of capital necessary to continue business operations is fatal to an alter ego claim. See In re Packaged Seafood Prod. Antitrust Litig., 338 F. Supp. 3d 1118, 1155 (S.D. Cal. 2018) (finding that the undercapitalization necessary to pierce the corporate veil was not shown in the absence of facts establishing that the defendant could not meet its operating expenses).

Plaintiffs fail to provide an overall picture of Worktap's operating expenses or the amount of capital necessary to carry on its operations. Instead, they cobble together various financial challenges faced by Worktap, ostensibly to show that it lacked adequate funds to operate. Specifically, Plaintiffs claim that: (1) the Individual Defendants did not invest

their own funds into Worktap from 2014 to 2017; (2) there were "overdue obligations to its investors and outside contractors for past services rendered"; (3) Worktap failed to make payroll on four occasions; (4) from December 2015 to November 2016, Chris loaned funds to Worktap to make payroll; and (5) Chris was paid minimum wage for a period of time in 2016, during which time his total wages were lower than those of the Individual Defendants. Pls.' Mot. at 4; C. Cummings Decl. ¶¶ 35-49. These contentions—which are largely unsupported by competent, admissible evidence—fail to demonstrate that Worktap was undercapitalized.

As an initial matter, Plaintiffs' argument regarding the level of the Individual Defendants' personal investment in Worktap is both misleading and inapt. The amount of monies raised by Worktap, regardless of the source, does not meaningfully address the question of whether Worktap was undercapitalized. Rather, it is the amount of operating capital *in relation to* the company's operating expenses that is germane. See Automotriz, 47 Cal. 2d at 797. That relationship has not been demonstrated. In any event, the suggestion by Plaintiffs that Worktap effectively had no operating capital is uncompelling. The record shows that, at the time he incorporated Worktap in 2012, Defendant Robinson invested $10,000 in exchange for common stock. Robinson Decl. ¶ 6 & Ex. D (Common Stock Purchase Agreement). Thereafter, from 2014 to 2017, Worktap raised an additional $2.5 million from 47 different investors. Robinson Decl. ¶ 52. Tellingly, Plaintiffs omit these facts from their motion papers.

Equally uncompelling are Plaintiffs' claims regarding Worktap's inability to satisfy certain of its financial commitments. As to their allegation that Worktap had "overdue obligations to its investors and outside contractors for past serviced rendered," see Mot. at 4, the only evidence offered in support of this assertion is an identical statement in the declaration of Chris, see C. Cummings Decl. ¶ 35. However, Chris' declaration provides no details regarding these allegedly "overdue obligations," such as the nature of the services provided, the outstanding balance due for said services or when the obligations were incurred and became due.

Likewise, allegations regarding Worktap's inability to fund payroll on various occasions and Chris' receipt of a reduced salary do not compel the conclusion, as Plaintiffs insist, that Worktap was undercapitalized. The record shows that, aside from Chris, who was hired in April 2015, Worktap hired three other employees in February, June and August 2015. Robinson Decl. ¶ 15, 16, 19. The first time Worktap missed payroll was in May 2016. C. Cummings Decl. ¶ 36. Thus, it is clear that Worktap was, in fact, sufficiently capitalized to meet its payroll obligations for at least a year after it began onboarding employees. As Individual Defendants readily acknowledge, however, by late 2015, Worktap was running out of money, allegedly due, in part, to Chris' failure to secure additional outside investments. Robinson Decl. ¶¶ 51, 53, 27. To keep the company afloat, Worktap sought to reduce costs by cutting the salaries of all employees, including Chris, to avoid any layoffs. Id. ¶¶ 53-54.[7] The mere fact that a small start-up business such as Worktap was later experiencing cash flow problems and engaged in cost-cutting measures does not demonstrate, as a matter of law, that the company was undercapitalized. See Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979) (holding that the corporate veil will not be pierced simply because an initially adequately capitalized company later becomes insolvent due to "bad financial times"); accord Laborers Clean-Up Contract Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 525 (9th Cir. 1984).

## 2. Joint Ownership

Plaintiffs next argue that the unity of interest between Worktap and the Individual Defendants is shown by the fact that the Individual Defendants owned over 90% of Worktap, controlled its operations and ran the company from Robinson's home. Mot. at 14-17. None of these contentions is compelling. "The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law." Katzir's Floor & Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1149

---

[7] Although it is true that Chris made a series of loans to Worktap, the company promptly repaid them, often within days. Id. ¶ 28.

(9th Cir. 2004); Leek v. Cooper, 194 Cal. App. 4th 399, 415 (2011) ("An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity."). Here, the record shows that Worktap was a small, closely-held corporation with no more than six employees, including the Individual Defendants. Thus, the fact that the Individual Defendants owned most of the company and controlled its operations, without more, does not support an alter ego finding. E.g., Eleanor Licensing LLC v. Classic Recreations LLC, 21 Cal. App. 5th 599, 616 (2018) ("That Tony Engel and Jason Engel, as co-owners of the two businesses, were authorized to make all decisions related to the license agreement and the manufacture and sale of the Eleanor replicas in no way indicates any commingling of personal and corporate assets, use of corporate assets for personal purposes, gross undercapitalization of the corporate entities, disregard of corporate formalities or any other of the many circumstances that might support the conclusion that no separation actually existed between these two individuals and the two corporate entities.").

### 3. Commingling of Funds

Next, Plaintiffs argue that the Individual Defendants commingled company funds by using Worktap's bank account as their personal "piggy bank." Mot. at 3-5, 22-23. More specifically, they claim that the Individual Defendants regularly withdrew substantial funds from Worktap's bank account for their personal benefit, misclassified personal disbursements and purchases as loans and company-related expenditures and paid themselves more than other employees. Mot. at 4-6 (citing C. Cummings Decl. ¶¶ 8, 31, 47, 51-61, 65, 66, 78, 79, 82, 84, 87-89, 102). As support, Plaintiffs rely on Chris' declaration, attached to which are purported bank statements from Worktap's bank account. Id. Ex. F (bank statements). Chris has highlighted certain line items on the statements that he asserts are "improper debits." Id. ¶¶ 42, 47, 54, 59, 60, 61, 65, 66, 68, 70-74, 79-82, 84. The Individual Defendants object to the cited portions of Chris' declaration for lack of personal knowledge and the accompanying bank statements as unauthenticated. See Fed.

1    R. Evid. 602 (personal knowledge requirement), 901(a) (authentication requirement).

2    Opp'n at 17-18.

3           Turning first to the issue of authentication, the Court finds that some of the

4    purported bank statements are properly authenticated while others are not.  Rule 901(a)

5    provides that "[t]o satisfy the requirement of authenticating or identifying an item of

6    evidence, the proponent must produce evidence sufficient to support a finding that the item

7    is what the proponent claims it is."  Fed. R. Evid. 901(a).  Chris claims that he "had online

8    access to Worktap's bank account" and "[i]n the course of executing [his] professional

9    duties, [he] regularly downloaded Worktap's bank account statements and bank transaction

10   data directly from the Company's Bank of Marin online bank account."  C. Cummings

11   Decl. ¶ 37.  He does not specifically state where and when he downloaded the bank

12   statements.  Nevertheless, the statements from July 14, 2014 to March 14, 2016, and

13   November 30, 2016 to March 31, 2017 are printed with the Bank of Marin name and logo,

14   and, by all appearances, seem to be what Chris purports them to be—actual bank

15   statements.  As such, the Court finds that those particular bank statements are properly

16   authenticated and that the Individual Defendants' authentication objection is overruled.

17   See Fed. R. Evid. 901(b)(4) (providing that documents can be authenticated by their

18   "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken

19   in conjunction with the circumstances").

20          The remaining alleged bank statements for the time-period from March 14, 2016 to

21   November 30, 2016 do not appear to be Bank of Marin statements.  Rather, those

22   documents are presented in the form of a Microsoft Excel spreadsheet which Chris claims

23   to have downloaded from the Bank of Marin website.  C. Cummings Decl. ¶ 37 n.3.  Nor is

24   the April 2017 "statement" is an official bank statement; rather, it is a print-out allegedly

25   given to Cummings "by the Bank Manager at the Bank of Marin."  Id.  None of these

26   "statements" facially appear to be Bank of Marin statements and therefore cannot be

27   authenticated pursuant to Rule 901(b)(4).  The Individual Defendants' objection is thus

28

sustained for lack of authentication as to those documents (i.e., the March 14, 2016 to November 30, 2016, and the April 2017 statements).

Authentication issues aside, Plaintiffs have failed to lay the proper foundation for their contention that the Individual Defendants made improper debits and transfers from Worktap's bank account. In his declaration, Chris recites no facts demonstrating his personal knowledge that each of the transactions he has highlighted, is, in fact, an improper debit. For example, some of the highlighted transfers appear to be payments to retailers, such as Best Buy and Amazon. C. Cummings Decl. ¶ 61, 66. Chris fails to specify what those apparent purchases were for or any facts that support his claim that the transfers were personal purchases. While it is possible that these purchases were for personal items, it is equally possible that they were business-related.[8] Given the lack of foundation for Chris' claim that the Individual Defendants made improper transfers, the Court sustains the Individual Defendants' objection to statements by Cummings in his declaration (including the highlights made on the bank statements) regarding the propriety of their expenditures from the Worktap bank account. Accordingly, the Court finds that Plaintiffs have failed to present any competent evidence to support their contention that the Individual Defendants commingled funds or used Worktap's bank account as their personal "piggy bank."

### 4. Corporate Formalities

The failure to observe corporate formalities (e.g., stock issuance, maintaining minutes, election of officers and directors, segregation of corporate records) is relevant to whether a sufficient unity of interest exists to pierce the corporate veil. See Brooklyn Navy

---

[8] In another example, Chris claims that Robinson made several personal mortgage payments directly from Worktap's bank account. C. Cummings Decl. ¶ 60. In his declaration, Chris asserts that "Robinson eventually told me that Kinecta was his mortgage bank." Id. ¶ 56. However, this does not show that Chris has personal knowledge that Robinson improperly paid his mortgage using company funds. Indeed, there is evidence that Kinecta is the bank that both serviced Robinson's mortgage and is where he, at that time, maintained his personal bank account. Robinson Decl. ¶ 65. While acknowledging that company-authorized distributions were made to his personal account for business reasons, Robinson denies that any direct payments were made from Worktap's account to his mortgage account. Id.

Yard Cogeneration Partners, L.P. v. Superior Court (Parsons Corp.), 60 Cal. App. 4th 248, 258 (1997). Plaintiffs aver that the Individual Defendants "showed no regard for corporate formalities" by failing to "properly constitute a Board" or "hold Board of Directors' and shareholders' meetings, let alone maintain proper records of such meetings." Mot. at 6 (citing C. Cummings Decl. ¶¶ 18, 106-130). The Individual Defendants object to the cited portions of Chris' declaration for lack of foundation under Rule 602 and improper expert opinion under Rule 702.

Chris first claims that Worktap only appointed one director when three directors are required, pursuant to California Corporations Code section 212. C. Cummings Decl. ¶ 18. Setting aside that Chris has not been qualified as an expert regarding corporate requirements, a witness—even an expert—cannot opine as to whether a legal violation has occurred. See Nationwide v. Kass Info. Sys., Inc., 523 F.3d 1051, 1059 (9th Cir. 2008) ("To the extent that an expert purports to offer a legal opinion on an ultimate issue, such testimony must be excluded because 'offering legal conclusion testimony invades the province of the trial judge.'") (citation omitted).[9] Aside from the board of director's issue, Plaintiffs present no evidence that Worktap failed to observe corporate formalities. In his declaration, Chris tacitly admits that he has no personal knowledge of Worktap's compliance. Rather, Chris states that he has "never seen minutes" of any directors or shareholder meetings and is unaware of any such meetings having been held. C. Cumming Decl. ¶ 106. Lack of awareness is obviously not probative of whether the meetings were held or whether minutes of the meetings exist. The Court therefore sustains Plaintiffs' objections to paragraphs 18 and 106 to 130 of Chris' declaration.

---

[9] That aside, Chris is incorrect. He cites Worktap's by-laws, which recite that "[t]he number of directors comprising the Board of Directors shall be one (1)." C. Cummings Decl. Ex. A § 2.1. The by-laws were adopted when Robinson incorporated Worktap in 2012. Robinson Decl. ¶ 5. At that time, Robinson was the sole shareholder. Id. ¶ 5. If there are fewer than three shareholders, the number of directors may be one or two. Cal. Corp. Code § 212(a); see also 2 Cal. Transactions Forms--Bus. Entities § 8:3 (2019) ("If there is only one shareholder, only one director is required.").

As an ancillary matter, Plaintiffs argue that Individual Defendants disregarded corporate formalities by "intentionally" and "willfully" misclassifying themselves as independent contractors of Worktap "to avoid taxes." Mot. at 6, 17-18 (citing C. Cummings Decl. ¶¶ 7, 8, 108, 114, 116-118, 127); see also C. Cummings Decl. ¶¶ 120, 121, 122, 123, 129. It is unclear how an alleged misclassification of worker status for payroll purposes bears upon whether Worktap complied with corporate formalities (as opposed to its tax obligations). Nonetheless, whether Worktap was legally required to classify the Individual Defendants as employees, as opposed to independent contractors, calls for a legal conclusion. Chris therefore is not competent to testify as to whether the Individual Defendants were misclassified. See Sellers v. Royal Bank of Canada, No. 12 CIV. 1577 KBF, 2014 WL 104682, at *2 (S.D.N.Y. Jan. 8, 2014) (allegation that an employee was misclassified was a "legal conclusion, not a factual allegation" and therefore need not be "credit[ed] … as fact on a motion for summary judgment"), aff'd, 592 F. App'x 45 (2d Cir. 2015). In addition, Chris is not competent to opine on the Individual Defendants' motive for classifying themselves as independent contractors; nor is he competent to opine or speculate on whether their actions were intended to avoid the payment of taxes. See Thomas v. Spencer, 294 F. Supp. 3d 990, 1004 (D. Haw. 2018) (declaration regarding an employer's motive was speculative opinion testimony under Rule 701(b)); Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC, No. 16 CIV. 6805 (JSR), 2017 WL 6413993, at *5 (S.D.N.Y. Nov. 22, 2017) ("These assertions of someone else's state of mind have no probative value and are inadmissible."). For these reasons, the Individual Defendants' objections to paragraphs 8, 116-118, 120, 121, 122, 123, 129 of Chris' declaration are sustained.

Finally, Plaintiffs contend that the Individual Defendants ignored corporate formalities by misclassifying personal disbursements as loans or expenses. Mot. at 6. While commingling of corporate and personal funds is relevant to the unity of interest inquiry, it is not probative to Worktap's compliance with corporate formalities. See Brooklyn Navy Yard Cogeneration Partners, L.P., 60 Cal. App. 4th at 258. In any event, as

discussed above, Plaintiffs have presented no admissible evidence to support their accusation that the Individual Defendants commingled company funds by misclassifying personal disbursements as loans or business expense reimbursements.

## B. INEQUITABLE RESULT

Even if Plaintiffs had demonstrated as a matter of law that a unity of interest existed between Worktap and the Individual Defendants, they have failed to satisfy the second prong of the alter ego test; to wit, there will be "an inequitable result if the acts in question are treated as those of the corporation alone." Wehlage v. EmpRes Healthcare, Inc., 791 F. Supp. 2d 774, 782 (N.D. Cal. 2011) (internal citation omitted). Under California law, "[f]inding an 'inequitable result' under the second element of alter ego liability 'generally require[s] some evidence of bad faith conduct on the part of defendants.'" Daewoo Elecs. Am. Inc. v. Opta Corp., 875 F.3d 1241, 1250 (9th Cir. 2017) (alteration in original, citation omitted); Perfect 10, 847 F.3d at 677 ("The alter ego doctrine ... instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form.") (alteration in original, internal quotations and citation omitted,); Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1112-13 (9th Cir. 1979) ("There was no evidence of any fraudulent intent in forming the corporation, and we find no substantial injustice will result if we respect the corporation.").

Plaintiffs argue that the failure to hold the Individual Defendants personally liable as alter egos of Worktap would be inequitable "because the Individual Defendants are the majority shareholders and exercise exclusive control over the Company's management, operations, and finances, and because Worktap has not repaid any of the principal or interest that Plaintiffs are due." Mot. at 21. This argument fails. As discussed, majority ownership and control of a corporation is legally insufficient to invoke the alter ego doctrine, especially where, as here, the corporation, is small and closely-held. See Meadows v. Emett & Chandler, 99 Cal. App. 2d 496, 499 (1950) ("Mere ownership of all the stock and control and management of a corporation by one or two individuals is not of

itself sufficient to cause the courts to disregard the corporate entity."); accord Eleanor
Licensing LLC, 21 Cal. App. 5th at 616.

Likewise, the fact that Worktap has not repaid the Notes and now appears presently
unable to do so does not establish the necessary inequitable result to pierce the corporate
veil.  Perfect 10, Inc. v. Giganews, Inc., 847 F.3d 657, 677 (9th Cir. 2017) (holding that the
mere difficulty in enforcing a judgment or collecting a debt "does not satisfy the injustice
standard for alter ego liability") (internal quotations omitted); Seymour, 605 F.2d at 1113
("While it is true that the trustees apparently have a judgment for several thousand dollars
against an insolvent defendant, their inability to collect does not, by itself, constitute an
inequitable result."); Sonora Diamond Corp., 83 Cal. App. 4th at 539 ("The alter ego
doctrine does not guard every unsatisfied creditor of a corporation but instead affords
protection where some conduct amounting to bad faith makes it inequitable for the
corporate owner to hide behind the corporate form.  *Difficulty in enforcing a judgment or
collecting a debt does not satisfy this standard*.") (emphasis added).

Next, Plaintiffs claim they would "suffer severe prejudice if the Individual
Defendants were allowed to have looted Worktap's assets for their personal gain with
impunity while causing Worktap to default on its contractual obligations to Plaintiffs."
Mot. at 22.  Repeating unsubstantiated claims made earlier in their motion, they accuse the
Individual Defendants of using company funds for personal purposes, improperly
classifying expenditures and otherwise using Worktap's bank account as "their piggybank
[sic]."  Id.  Accusations of commingling of funds and financial improprieties are germane
to the unity of interest element, as opposed to the inequitable result element.  That
notwithstanding, as discussed above, Plaintiffs' claims are entirely unsupported by any
competent, admissible evidence.

Equally uncompelling is Plaintiffs' ancillary contention that the Individual
Defendants engaged in "multiple underhanded maneuvers" to avoid repaying the Notes and
to render Worktap judgment-proof.  Mot. at 23, 8.  In support of this contention, Plaintiffs
assert that on or about July 3, 2018, the parties reached a settlement, pursuant to which the

Individual Defendants were to make an initial payment of $125,000. Id. at 8.[10]  Plaintiffs

now contend that the Individual Defendants acted in bad faith, as they allegedly never had

any intention of complying with the settlement.  Id.  As support, Plaintiffs accuse the

Individual Defendants of having: (1) caused the closure of Worktap's bank account one

week after entering into the Settlement Agreement; (2) failed to make the first installment

settlement payment in the amount of $125,000; and (3) requested an extension of time to

make the first payment but never made the payment.  Mot. at 8 (citing Francis Decl. ¶ 27).

As a threshold matter, and as this Court has already explained in a prior Order, Dkt.

84, there is no claim for breach of the Settlement Agreement alleged in the pleadings.  As

such, issues pertaining to the Individual Defendants' alleged breach of the Settlement

Agreement are beyond the scope of this action.  See Kokkonen v. Guardian Life Ins. Co. of

Am., 511 U.S. 375, 381 (1994) (holding that federal courts have no jurisdiction to enforce a

settlement agreement entered into by the parties without an order or judgment specifically

retaining jurisdiction over the settlement agreement or incorporating the terms of the

settlement agreement).  In any event, Plaintiffs' accusations, which are unsupported by

competent evidence, amount to nothing more than conjecture.  The record shows that the

Bank of Marin—not the Individual Defendants—closed Worktap's bank account.

Robinson Decl. ¶ 75 & Ex. U (email from Bank of Marin explaining that the Worktap

account was closed by the bank due to "insufficient activity").  As for Worktap's failure to

make the initial settlement payment, the evidence shows that their failure to fulfill the terms

of the Settlement Agreement was due to the inability to secure financing necessary to the

---

[10] Plaintiffs did not inform the Court of the settlement until September 10, 2018, when their counsel filed a letter accusing Defendants of failing to comply with the terms of the Settlement Agreement.  Dkt. 83.

fund the settlement, as opposed to an intentional avoidance of their payment obligations. Id. ¶ 76.[11]

The cases cited by Plaintiffs are inapposite. In <u>King v. Emerald Energy, LLC</u>, No. CV-F-09-2128 LJOMSMS, 2010 WL 3943644 (E.D. Cal. Oct. 4, 2010), the district court granted the plaintiff's unopposed motion for summary judgment and ruled that the pro se individual defendant was the alter ego of the corporate defendant and therefore was personally liable on four promissory notes executed by the corporation. Here, Plaintiffs assert that "Worktap's failure to pay and the Individual Defendants' ownership and control of the Company are sufficient under <u>King</u> to satisfy the second alter ego prong." Mot. at 21. However, nothing in <u>King</u> stands for the proposition that a shareholder's mere ownership and control of a corporation is sufficient to establish that a failure to pierce the corporate veil would be inequitable. Indeed, as discussed, such a rule would be contrary to California law. See <u>Perfect 10</u>, 847 F.3d at 677; <u>Meadows</u>, 99 Cal. App. 2d at 499.

Plaintiffs cite <u>NEC Electronics Inc. v. Hurt</u>, 208 Cal. App. 3d 772 (1989) for the proposition that improper "loans" by the corporation to the shareholder "is an act that, *on its own*, has been found to satisfy the second prong." Mot. at 21 (emphasis added). According to Plaintiffs, the court in <u>NEC</u> upheld the trial court's alter ego finding based solely on evidence that the corporation had made $2.8 million in loans to it sole shareholder and Chief Executive Officer. Plaintiffs' characterization of <u>NEC</u> is inaccurate. In finding that the inequitable result prong had been satisfied, the <u>NEC</u> court took into account the loan *along with evidence that*: the corporation paid insurance, berthing fees, maintenance and fuel expenses for a boat owned by the shareholder; made automobile lease payments

---

[11] Plaintiffs also assert that shortly after the Magistrate Judge recommended granting a writ of attachment in this action, the Individual Defendants misrepresented to Worktap investors and the Court that one of Worktap's investors, Corinthian Investors, LLC ("Corinthian"), was foreclosing on Worktap's assets. Mot. at 7. It is unclear how this alleged misrepresentation supports the notion that the Individual Defendants attempted to render Worktap judgment-proof. Nonetheless, there was no misrepresentation, as Corinthian had, in fact, served a notice of default and right to foreclose on its promissory note. Robinson Decl. ¶ 74. Corithinian did agree, however, to delay the foreclosure to allow Worktap the opportunity to seek additional investors. <u>Id.</u>

for the shareholder's wife (who was not a company employee); and made over 30 mortgage payments on the shareholder's personal residence. Id. The shareholder also commingled funds by using his personal funds to pay corporate obligations, property taxes, rent, payroll and legal expenses. Thus, despite Plaintiffs' assertions to the contrary, NEC does not hold that a personal loan to a shareholder "on its own," is sufficient to meet the inequitable result prong of the alter ego test. Nor are the facts in NEC analogous to those at issue in this case.

The Court finds that Plaintiffs have failed to demonstrate that an inequitable result will follow if the Individual Defendants are not treated as alter egos of Worktap with respect to its obligations on the Notes. Irrespective of any alleged improprieties by the Individual Defendants—which are unproven—the record does not show or suggest that the Individual Defendants utilized Worktap's status as a corporation to bilk unsuspecting investors. See Seymour, 605 F.2d at 1112-13 ("There was no evidence of any fraudulent intent in forming the corporation, and we find no substantial injustice will result if we respect the corporation.").

Nor has any evidence been presented suggesting that Plaintiffs are unsuspecting investors whose putative inability to collect on the Notes warrants the extreme remedy of piercing Worktap's corporate veil. To the contrary, the record confirms that Plaintiffs invested in Worktap with full awareness of the corresponding risks. In both Notes, Plaintiffs expressly acknowledged that, prior to investing in Worktap, they were afforded a full and fair opportunity to conduct the necessary due diligence regarding the company's finances. In the section entitled, "Representations and Warranties by the Purchaser," the Notes contain the following acknowledgement:

> During the negotiation of the transactions contemplated herein, the *Purchaser and its representatives have been afforded full and free access to corporate books, financial statements, records, contracts, documents, and other information concerning the Company*, and to its offices and facilities, have been afforded an opportunity to ask such questions of the Company's officers, employees, agents, accountants and representatives concerning the Company's business, operations, financial condition, assets, liabilities and other relevant matters as they have deemed necessary or desirable, and *have been given all such information as has been requested, in order to*

*evaluate the merits and risks of the prospective investment contemplated herein.*

2015 Note § 4 (emphasis added), Dkt. 21-1; 2016 Note § 4, Dkt. 21-2.  Notably, there is no allegation or evidence that Worktap or the Individual Defendants withheld information from Plaintiffs regarding the financial status of the company.  Moreover, Plaintiffs had ready access to that information through Chris, who solicited their investments. C. Cummings Decl. in Supp. of Ex Parte Appl. ¶ 5, Dkt. 38-6 ("I asked Jon[athan Cummings] to invest on two occasions, which he did.").  While at Worktap, Chris was responsible for Worktap's finances and accounting and claims to have been aware of the company's cash flow problems and Individual Defendants' alleged financial improprieties. E.g., C. Cummings Decl. ¶¶ 36, 37, 41-66; Lee Decl. ¶ 8.  Given Chris' close relationship with Plaintiffs, coupled with his knowledge of Worktap's finances, Plaintiffs are hard-pressed to demonstrate that they chose to invest in Worktap without knowledge of the attendant risks.  See Harper v. Del. Valley Broads., Inc., 743 F. Supp. 1076, 1086 (D. Del. 1990) (denying veil-piercing claim brought by director and shareholder of corporation, since he "was not an innocent outsider" and failed to point to any "unfairness or inequity" besides "the fact that he has not been paid"), aff'd 932 F.2d 959 (3d Cir. 1991).[12]

In addition, Plaintiffs could have protected themselves against a default on the Notes by obtaining personal guarantees from the Individual Defendants, which they failed to do. See KMart Corp. v. First Hartford Realty Corp., 810 F. Supp. 1316, 1328 (D. Conn. 1993) ("[I]t would be neither equitable nor legally correct to pierce the corporate veil and find Ellis personally liable for any delict that has in fact occurred.  KMart freely chose to deal with a corporate entity without the benefit of personal guarantees."); see also Cascade Energy and Metals Corp. v. Banks, 896 F.2d 1557, 1577 (10th Cir. 1990) (noting that the alter ego doctrine should be applied more sparingly in contract cases than in tort or other third-party liability cases, because "the claimants in consensual transactions generally have

---

[12] Indeed, at the time Plaintiffs tendered their second investment in the amount of $50,000 in February 2016, Chris had already made five loans to Worktap to ensure that it could make payroll.  C. Cummings Decl. ¶¶ 44-45.

chosen the parties with whom they have dealt and have some ability, through personal guarantees, security agreements, or similar mechanisms, to protect themselves from loss"). In sum, this simply is not a case where the failure to hold the Individual Defendants personally liable on the Notes executed by Worktap would constitute an inequitable result.

## IV. <u>CONCLUSION</u>

The Court finds that Plaintiffs have failed to demonstrate, as a matter of law, that the Individual Defendants are alter egos of Worktap. To the contrary, despite having a full and fair opportunity to prove its case, the record before the Court demonstrates that this is not the rare or exceptional case that warrants piercing Worktap's corporate veil. <u>See</u> <u>Dole Food Co.</u>, 538 U.S. at 475. Thus, for the reasons stated herein, the Court denies Plaintiffs' motion for summary judgment and finds that summary judgment should be entered in favor of the Individual Defendants. <u>See</u> <u>Nozzi v. Hous. Auth. of City of Los Angeles</u>, 806 F.3d 1178, 1199 (9th Cir. 2015) ("[T]here is no genuine dispute of material fact for a fact-finder to decide. In this case, therefore, the appropriate remedy is to grant summary judgment in favor of the plaintiffs *nostra sponte*."), <u>as amended on denial of reh'g and reh'g en banc</u> (Jan. 29, 2016). Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Plaintiffs' unopposed administrative motion for leave to file certain exhibits under seal is GRANTED.

2.      Plaintiffs' Motion for Summary Judgment Against Defendants Mark Robinson and David Lee is DENIED.

3.      Summary judgment is entered in favor of the Individual Defendants.

4.      By no later than <u>September 20, 2019</u>, Plaintiffs shall file their motion for default judgment as to Worktap. The motion shall be limited to 15 pages in length, as specified by the Court's Standing Orders. The failure to file a timely and procedurally proper motion will result in the dismissal of this action under Federal Rule of Civil Procedure 41 with prejudice.

1    IT IS SO ORDERED.

2    Dated:  09/04/19

3                                              SAUNDRA BROWN ARMSTRONG
                                               Senior United States District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28